IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KATHRYN A. VOGEL,

       Plaintiff,

vs.                                                                            Civil No. 04-605 BB/RLP

JO ANNE B. BARNHART,
Commissioner of the
Social Security Administration,

       Defendant.

**UNITED STATES MAGISTRATE JUDGE'S
ANALYSIS AND RECOMMENDED DISPOSITION[1]**

1.       Plaintiff invokes this court's jurisdiction under 42 U.S.C. §405(g), seeking judicial review of a final decision of the Commissioner of Social Security finding that Plaintiff is not eligible for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act. Plaintiff moves this court for an order reversing the Commissioner's denial and remanding the matter to the Commissioner for a new hearing. I review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Andrade v. Sec'y of Health & Human Servs., 985 F.2d 1045, 1047 (10th Cir.1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Fowler v. Bowen, 876 F.2d 1451, 1453 (10th Cir.1989) (internal quotation marks omitted). I consider whether the Commissioner followed the "specific rules of law that must be followed in weighing particular types of evidence in disability

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to *28 U.S.C. §636(b)(1)*, file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

cases," Reyes v. Bowen, 845 F.2d 242, 244 (10th Cir.1988), but I will not reweigh the evidence or substitute my judgment for the Commissioner's, see Qualls v. Apfel, 206 F.3d 1368, 1371 (10th Cir.2000).

## Issues on Appeal

2.        Plaintiff contends that the Commissioner, though her administrative law judge ("ALJ" herein), committed the following two errors, requiring reversal and remand for new hearing: (1) the ALJ, by discounting the opinion and limitations expressed by Paula Hughson, M.D., a psychiatrist retained by the New Mexico Disability Services, failed to apply correct legal principles in evaluating Plaintiff's mental residual functional capacity, and (2) the hypothetical question posed to a vocational expert, and upon which the ALJ based his findings at step five of the sequential evaluation process, failed to include all of Plaintiff's functional limitations.

## Administrative History

3.        Plaintiff filed applications for disability insurance benefits and supplemental security income on August 4, 2001.  Plaintiff suffers from fibromyalgia[2].  She alleges disability due to shoulder pain radiating down her left arm, pain and cramping in the left thigh and calf, difficulty walking, anxiety attacks, depression, fatigue, insomnia, and decreased ability to concentrate. (Tr. 107, 38,  318, 135, 244, 139, 318 ). Her applications were denied at the first and second levels of administrative review.

---

[2]"Fibromyalgia syndrome . . .  is characterized by widespread muscle pain, fatigue, and multiple tender points at specific places on the body—on the neck, shoulders, back, hips, and upper and lower extremities—where people with fibromyalgia feel pain in response to slight pressure. . . It does not cause inflammation or damage to the joints, muscles, or other tissues (but) . . . can cause significant pain and fatigue, and it can interfere with a person's ability to carry on daily activities. . . In addition to pain and fatigue, people who have fibromyalgia may experience sleep disturbances,  morning stiffness, headaches, irritable bowel syndrome, painful menstrual periods, numbness or tingling of the extremities, restless legs syndrome, temperature sensitivity, cognitive and memory problems (sometimes referred to as "fibro fog"), or a variety of other symptoms."   www.nlm.nih.gov/medlineplus/fibromyalgia.

She requested and received a hearing before an administrative law judge ("ALJ" herein). The ALJ found that Plaintiff was not disabled in a decision dated March 3, 2003. The Appeals Council denied Plaintiff's request for review of the ALJ's decision. The decision of the ALJ therefore became the final decision of the Commissioner for the purposes of judicial review.

## Statement of the Facts

4.  Plaintiff was born on May 11, 1959. She dropped out of high school either during or after the 11th grade. She has past work experience as a stocker and cashier in retail stores. Between February 2000 and April 10, 2001, her alleged date of onset of disability, Plaintiff was seen on nine occasions at a clinic staffed by physicians from the University of New Mexico Hospital for complaints of anxiety, depression, headache and chronic pain. Her pain was initially localized to trigger points in the trapezius muscles, and was unrelieved by steroid injections, physical therapy[3] or pain medication[4].

5.  After extensive work up to rule out other causes of her pain complaints, Plaintiff was diagnosed with fibromylagia, a condition the Commissioner accepts as a serious impairment. Her work up and treatment continued through the University of New Mexico, where she was seen by several physicians, but most frequently by Michael Urbano, M.D.[5] Plaintiff's medical condition was

---

[3]Plaintiff's physical therapy records are not contained in the administrative record. Notations in treating physician records indicate that she attended physical therapy for two months at some point prior to April 2001. (Tr. 335).

[4]Plaintiff had been taking an antidepressant, Paxil since February 2000.(Tr. 346). She was placed on Norflex and Tylenol #3 on November 15, 2000 for severe pain (Tr. 342); Inderol for anxiety and tachycardia on November 18, 2000 (Tr. 340) and high dose Ibuprofen on November 28, 2000 for pain. (Tr. 339).

[5]Dr. Urbano was a resident in Internal Medicine (Tr. 467). He saw Plaintiff eleven times from August 2001 to August 2002. His treatment notes indicate that he discussed Plaintiff's care with an attending physician at every visit, and that the attending agreed with his assessment and plan. (See Tr. 318-

treated with various pain medications, sleep medication and antidepressants. In addition, she was also referred for a psychiatric consult, because it was determined that anxiety and depression could be contributing to her fibromyalgia syndrome. (Tr. 269-270, 264-265).

6.  On December 19, 2001, Plaintiff had a formal mental health assessment at the University of New Mexico Mental Health Center by C.S Combs, a licensed social worker.(Tr. 384-390). Based on history and mental status examination[6], Plaintiff was diagnosed as suffering from a Mood disorder, depression due to her medical condition[7], and assigned her a GAF score of 45.[8] She was scheduled for cognitive therapy to aid in pain management and coping skills.

7.  On January 19, 2002, Paula Hughson, M.D., conducted a comprehensive psychiatric evaluation of Plaintiff at the request of the New Mexico Disability Determination Services. Dr. Hughson was not given any medical records to review. She based her evaluation on a detailed history obtained from Plaintiff[9], as well as a mental status examination.[10] Dr. Hughson diagnosed

---

319, 316-317, 314-315, 312-313, 310-311, 308-309, 416-418, 410-411, 401-402, 399-400, 393-394).

[6]The mental status examination form prepared by Ms. Combs stated that Plaintiff exhibited some confusion due to her medications; that her behavior included abnormal body spasms, lethargy, spurts of hyperactivity and psychomotor retardation; that her thought processes exhibited some disorganization; that her thought content included some auditory hallucinations and suicidal ideation, and that she reported recent memory deficits. (Tr. 386).

[7]The Axis III diagnosis listing significant medical conditions cited fibromyalgia, hypothyroidism, and possible uterine/ovarian cysts. The presence of all conditions is supported in the medical record.

[8] A GAF of 45 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed.2000).

[9]Plaintiff's history disclosed abuse in her family of origin and first marriage, chronic medical problems and legal and behavioral problems involving her three sons.

[10]"She comes to the appointment with her husband and is interviewed alone. She is on time. She is a slender white woman of medium height, who appears her age. She is dressed casually, with fair grooming, and she emits a very strong odor of cigarettes. She is walking somewhat clumsily with a cane.

Somatoform disorder, possibly an expression of post traumatic stress disorder, severe, and assigned a current and 1 year GAF of 45-50 (serious symptoms and serious impairment). (Tr. 286-289). She completed a Psychiatric-Psychological Source Statement of Ability to Do Work Related Activities (Tr. 283-285), indicating the following limitations due to anxiety, depression, preoccupation with somatic symptoms/chronic pain, being scattered and worries about children and finances:

| **Moderately limited**[11] | **Moderately to Markedly Limited** | **Markedly limited**[12] |
|---|---|---|
| Ability to:<br>  --carry out instructions<br>  --work without supervision<br>  --interact with the public, coworkers and supervisors<br>  --be aware of normal hazards and react appropriately<br>  --use public transportation or travel to unfamiliar places | Ability to:<br>  -- understand and remember detailed or complex instructions<br>  --attend and concentrate | --Ability to adapt to changes in the workplace |

In terms of functional abilities, Dr. Hughson stated, "although she could understand and even execute

---

She is wearing no make up or jewelry. She appears, especially in the beginning of the interview, extremely anxious and somewhat disorganized. She has considerable difficulty expressing herself, although she tried to do her best and tries to be personable. Her voice is low and hoarse. She talks excessively and it is difficult to interrupt. Her use of language is poor; she chops words or stumbles over words, and in general has difficulty expressing herself and giving her history in an organized manner. She does do much better after she becomes more settled as the interview goes on. Affect is anxious but otherwise full. Mood is anxious, depressed and sometimes despairing. Although she does not have suicidal thoughts, she frequently feels "tired of not being able to support (herself)" and thinks that if not for her present husband's support, she would be very tempted to turn the children over to their father and then doesn't know what she would do with herself. She has not had any other episodes of disassociation since the running away episode three years ago. There is no evidence of delusions or bizarre thoughts and there are no visual or auditory hallucinations. She seems of average intelligence. She is alert and oriented to time, person and place. She can name only the past two Presidents. She can remember 2/3 objects in five minutes and she struggles through serial 7s where she makes numerous arithmetic mistakes. She is able to spell "world" and is able to correctly spell it backwards. Judgment and insight are considered adequate."

[11]Defined as an impaired capacity, the degree/extent of the impairment requiring further description.

[12]Defined as an inability to usefully perform or sustain the activity.

a short and simple work sequence, presently her pain symptoms and associated anxiety and depression are such that she could not organize herself sufficiently to work in a reliable manner." (Tr. 289).

8.      On January 31, 2002, a non-examining agency psychologist, LeRoy Gabaldon, PhD., completed a Mental Residual Functional Capacity Evaluation and Psychiatric Review Technique form, assessing Plaintiff's mental impairment. Dr. Gabaldon found that Plaintiff suffered from Anxiety related[13] and Somatoform[14] disorders which moderately limited her ability to maintain concentration, persistence or pace. (Tr. 299, 300, 304). Dr. Gabaldon's assessment of Plaintiff's functional limitations differed from that of Dr. Hughson's, in that he found only moderate limitation in her ability to maintain attention and concentration. Dr. Gabaldon's evaluation was reviewed and affirmed without additional comment by a second agency physician, Jill Blachach, M.D. a specialist in general, preventative medicine. (Tr. 292, 428).

9.      Plaintiff continued to seek treatment on a regular basis for both her physical and mental ailments. On February 14, 2002, she was evaluated at the University of New Mexico Mental Health Center. At that time she reported some improvement, but continued exhaustion and chronic pain. Dr. Hensley, an attending psychiatrist, increased her dosage of Paxil, an antidepressant, added a second antidepressant, Trazodone, and discussed initiating individual/group therapy. (Tr. 382). Two weeks later Dr. Urbano noted that the Trazodone had improved Plaintiff's ability to sleep, but had not ameliorated her pain complaints. (Tr. 417). She was placed on Neurontin (Tr. 379) and Nortriptyline (Tr. 378, 414).

---

[13] Based on recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. (Tr. 299).

[14] Persistent, non-organic sensation of pain. (Tr. 300).

10.     By July 2002, Plaintiff's mental health provider noted that her major depressive disorder was partially responding to medication. Her antidepressant was switched from Paxil to Celexa for financial reasons. (Tr. 376).

11.     On July 25, 2002, Plaintiff reported to Dr. Urbano that her pain was controlled with medication, but that she still suffered from lack of energy. (Tr. 399). Ten days later she was admitted to the hospital and subsequently to the Mental Health Center for an overdose of prescription drugs. (Tr. 395-7, 430-436, 369-370). She attributed her suicide attempt to overwhelming stress caused by her medical problems, and by behavioral/legal problems of her sons.(Tr. 368). By September, Plaintiff was also being treated for dysfunctional uterine bleeding. She continued to complain of muscle pain. Her physicians continued to prescribe numerous medications, including Soma, Neurontin, Oxycodone, Nortriptyline, Celexa and Trazodone (Tr. 393-394).

12.     On December 5, 2002, Dr. Urbano prepared a Fibromyalgia and Myofascial Pain Syndrome Functional Questionnaire at the request of Plaintiff's legal representative. (Tr. 467-471). In this document, Dr. Urbano indicated that Plaintiff met the clinical criteria for fibromyalgia[15], that her ability to walk, push, grasp, stand, reach, lift and carry was limited; that her ability to sit, pull and fine manipulation was not limited, and that she could lift and/or carry up to 10 pounds frequently and 15 lbs. occasionally. In terms of how much Plaintiff could work, Dr. Urbano filled in blanks indicating she could sit for eight hours, stand for 3 three hours and walk for 3 hours in an eight-hour day provided she alternate her position. Later in the report he wrote that pain and fatigue limited the

---

[15]Dr. Urbano listed the following symptoms as present in Plaintiff's case: Multiple tender points, non-restorative sleep, chronic fatigue, numbness or tingling, hypothyroidism, Raynaud's phenomenon, morning stiffness, subjective swelling, depression, multiple trigger points, mood swings, dysmenorrhea, anxiety, myofacial pain syndrome, headaches/migraines. (Tr. 470-471).

hours she could work in a work week, that she could not perform work activities for eight hours a day, five days a week, that she could be expected to miss one day of work in five, and that she would need to take unscheduled breaks as work due to her medical problems. (Compare Tr. 468 with Tr. 470).

13. At the December 11, 2002, hearing, the ALJ took testimony from Plaintiff and a Vocational Expert ("VE" herein). The ALJ asked the VE to assume an individual with Plaintiff's vocational factors, who could lift 20 lbs. occasionally, 10 pounds frequently, stand up to 2 hours in 8, sit for 6 or more hours in 8, could do no prolonged walking or standing, needed a sit/stand option, could occasionally climb, balance, stoop, kneel, crawl, crouch, could never climb ropes, ladders or scaffolding, and who was further limited to simple, repetitive work. The VE testified that such an individual could perform the light, unskilled jobs of office helper (2,688,000 in the national economy), parking lot attendant (63,000 in the national economy) and shipping and receiving clerk (260,000 in the national economy). (Tr. 58-59).

## The ALJ's Decision

14. The ALJ found that Plaintiff suffered from severe impairments of fibromyalgia, an anxiety related disorder, an effective disorder and a somatoform disorder, but did not meet the criteria for a listed impairment. In assessing Plaintiff's residual functional capacity, both mental and physical, he gave great weight to the opinions of non-examining state agency physicians, some weight to the opinions of Dr. Urbano[16], and little weight to the opinion of Dr. Hughson. With regard to Dr.

---

[16]With regard to Dr. Urbano, the ALJ stated that he had contradicted himself at some points in his December 5, 2002, questionnaire, but did rely Dr. Urbano's statement that Plaintiff "had the ability to lift and/or carry up to 10 lbs. occasionally and 20 lbs. frequently, to sit for 8 hours in an 8 hour work day, to stand for 3 hours in an 8 hour week day, and to walk for 3 hours in an 8 hour work day." (Tr. 23).

Hughson, the ALJ disregarded her opinion because "it is based on (Plaintiff's) subjective complaints and these are not supported by the record as a whole." (Tr. 23)

15.   The ALJ found that Plaintiff retained the residual functional capacity consistent with the hypothetical set out in ¶13, supra. He found that she could not return to her past work. He applied the Medical Vocational Guidelines as a framework, and found that she could perform a significant number of jobs in that national economy, and was therefor not disabled.

## Analysis

16.   Pursuant to the Commissioner's regulations, every medical opinion of record is to be considered in making disability determinations. 20 C.F.R. §1527(d). The weight an ALJ must give each opinion, however, varies according to the relationship between the medical professional and the claimant. See id.; Social Security Ruling 96-6p, Soc. Sec. Rep. Serv., Rulings 1992-2002, 129, 130 (West 2002) (hereinafter SSR 96-6p). The ALJ is required to give the opinion of a treating physician controlling weight if it is both well-supported by medically acceptable clinical and laboratory diagnostic techniques consistent with other substantial evidence in the record. Watkins v. Barnhart. 350 F.3d 1297, 1300 (10th Cir. 2003). The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight. 20 C.F.R. §§ 404.1527(d)(1), (2) and 416.927(1), (2); SSR 96-6p. If the treating source's opinion is not given controlling weight, the regulations provide a list of factors to be used in determining the appropriate evidentiary weight to be given all medical opinions of record. These factors are:

> (3) *Supportability*. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the

more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinion will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including the opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. . . .we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. . . .

20 C.F.R. §404.1527(d).

17.     None of Plaintiff's treating mental health care providers gave a formal opinion as to her mental residual functional capacity. Therefore, the issue before the court is whether the ALJ applied correct legal principles in evaluating the opinions of the Dr. Hughson and Dr. Gabaldon, both of which can be viewed as specialists in their respective fields of psychiatry and psychology. See 20 C.F.R. §404.1527(d) (5).

18.     Psychological opinions "may rest either on observed signs and symptoms or on psychological tests." Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir.2004) (citing 20 C.F.R. Subpart P, App. 1 § 12.00(B)). Dr. Hughson's opinion was based in part on findings from Plaintiff's mental status examination, which included abnormalities in speech, thought process, mood and affect. (Tr. 288). Dr. Hughson's observations about claimant's functional limitations constitute specific medical findings, not simply a regurgitation of subjective complaints.

19.     Based on her evaluation, Dr. Hughson reached opinions regarding Plaintiff's mental residual

10

functional capacity, the most significant of which were moderate to marked inability attend and concentrate which precluded the ability to "organize . . . sufficiently to work in a reliable manner." (Tr. 289).

20. Dr. Gabaldon stated that Plaintiff's ability to maintain concentration was moderately limited, and her ability to maintain regular attendance was not significantly limited. (Tr. 290). His "support" for these opinions was "(She) appears to have the capacity to understand/remember and to socialize. She may have some limitation in her capacity to attend/concentrate and adapt." (Tr. 292). This explanation does not clarify his opinion or cite to medical evidence which would render his opinion more "supportable" than that of Dr. Hughson. See 20 C.F.R. §404.1527(d) (3).

21. Turning to the factor of consistency, Dr. Hughson's December 19, 2001, GAF rating of 45-50 is consistent with the GAF assigned one month earlier by a treating mental health care professional. Dr. Hughson stated that this level of impairment had been present for one year. Dr. Gabaldon did not discuss GAF. Dr. Hughson and Dr. Gabaldon agree that there was no evidence of a thought disorder or severe cognitive limitation. This is consistent with the medical record. Dr. Gabaldon stated that there was no evidence of severely impaired daily activities. He did not delineate what activities Plaintiff could or could not perform. Dr. Hughson did not discuss Plaintiff's daily activities, but did refer to Plaintiff's history of difficulty working due to pain, sleep disturbance and use of a cane to walk, all of which are supported in the record. (Tr. 286-289, 312-313, 322, 336, 330-331, 325, 320, 319, 139, 376, 389, 380, 379, 413, 437, 468).

22. Considering the factors set out in 20 C.F.R. §1527 (d), I find that the ALJ failed to apply correct legal principles when he discounted Dr. Hughson's opinion in favor of Dr. Gabaldon's. Based on that error of law, I further find that this matter should be remanded to the Commissioner of Social

Security for additional proceedings in order that correct legal principles may be applied in the evaluation of medical opinions pertinent to ascertaining Plaintiff's mental residual functional capacity.

<u>Recommended Disposition.</u>

23.    I recommend that Plaintiff's Motion to Reverse and Remand be granted, and that this cause be remanded to the Commissioner of Social Security for additional proceedings to include reassessment of Plaintiff's mental residual functional capacity.

Richard L. Puglisi<br/>
United States Magistrate Judge